MARION J. FOSTER v. THE NORTH CAROLINA MEDICAL CARE
COMMISSION; DR. LENNOX D. BAKER, SECRETARY OF THE DEPART-
MENT OF HUMAN RESOURCES; I. O. WILKERSON, JR., ACTING DIREC-
TOR OF THE NORTH CAROLINA MEDICAL CARE COMMISSION; W. L.
TURNER, DIRECTOR OF THE DEPARTMENT OF ADMINISTRATION OF THE
STATE OF NORTH CAROLINA; FRANK R. JUSTICE, ACTING STATE
BUDGET OFFICER OF THE STATE OF NORTH CAROLINA; FRANK A.
TOMCZAK, ACTING STATE DISBURSING OFFICER OF THE STATE OF
NORTH CAROLINA

No. 20

(Filed 11 April 1973)

1. **Constitutional Law § 7; Hospitals § 2— Hospital Facilities Finance Act
— no delegation of legislative authority**

The North Carolina Medical Care Commission Hospital Facilities
Finance Act, G.S. 131-138 *et seq.*, does not unlawfully delegate legisla-
tive authority to the Medical Care Commission in violation of Article
I, § 6 of the Constitution of North Carolina, since in such Act the
Legislature has declared the policy of the State, has established the
broad framework of law within which it is to be accomplished and
has established standards and requirements which the Commission
is to observe in determining the eligibility of each proposed project
for the contemplated financial aid.

2. **Administrative Law § 5— administrative agency — conditions precedent
to exercise of statutory authority — judicial review**

The determination by an administrative body that in a specific
instance it has complied with conditions precedent to the exercise of
its statutory authority is its determination of a question of law and
is subject to judicial review.

3. **Hospitals § 2; Taxation §§ 4, 6— Medical Care Commission revenue
bonds — no debt of State — no lending of faith and credit of State**

The Act authorizing the Medical Care Commission to issue revenue
bonds to finance the construction of hospital facilities to be leased
and ultimately conveyed to a public or private nonprofit agency does
not authorize the contracting of a debt by the State, or its agency,
or lending of the faith and credit of the State, or its agency, in
violation of Article V, §§ 3(1) and 3(2), respectively, of the Consti-
tution of North Carolina.

4. **Hospitals § 2; Taxation § 4— Hospital Facilities Finance Act — un-
constitutionality — increase of local government debt without vote**

Provisions of the North Carolina Medical Care Commission Hos-
pital Facilities Finance Act which authorize local government units
to enter into lease agreements with the Medical Care Commission and
which make obligations of any such governmental unit under a lease
agreement payable not only from revenues derived from the leased
facility but also from revenues derived from other hospital facilities
owned by the lessee and related to the leased facility *are held* un-
constitutional in that they authorize local government units to contract
a debt without a vote of the people in excess of the amount specified
in Article V, § 4, of the Constitution of North Carolina.

5. Hospitals § 2; Taxation·§ 21— property owned by Medical Care Commission — exemption from taxation

The statute exempting from taxation property and income from property owned by the Medical Care Commission pursuant to the provisions of the North Carolina Medical Care· Commission Hospital Facilities Finance Act, G.S. 131-158, is constitutional since such property is owned by the State within the meaning of Article V, § 2(3), of the Constitution of North Carolina.

6. Hospitals § 2; Taxation § 7— public purpose — private nonprofit hospital

The circumstance that a privately owned hospital is·not operated for profit is not determinative of whether the construction and operation of such hospital is for a public purpose within the meaning of the constitutional limitation upon the use of tax funds.

7. Hospitals § 2; Taxation § 7— public purpose — use of tax funds for construction of private hospital — unconstitutionality

The expenditure of public funds raised by taxation to finance or facilitate the financing of the construction pursuant to G.S. 131-138 et seq. of a hospital facility to be privately operated, managed and controlled is not an expenditure for a public purpose and is prohibited by Article V, § 2(1), of the Constitution of North Carolina.

APPEAL by plaintiff from *Bailey, J.,* in Chambers of the Superior Court of WAKE on 8 December 1972, heard prior to determination by the Court of Appeals.

Pending the appeal, David T. Flaherty and William L. Bondurant were, by consent, substituted as parties defendant for Dr. Lenox D. Baker and W. L. Turner, respectively.

The plaintiff, as taxpayer, on behalf of himself and other taxpayers of North Carolina, instituted this action to enjoin the defendants against taking contemplated steps to implement and carry out the North Carolina Medical Care Commission Hospital Facilities Finance Act, hereinafter called the Act, enacted in 1971 and found in G.S. 131-138 to G.S. 131-162. The complaint alleges:

The Act violates the Constitution of North Carolina and the Constitution of the United States in that: (a) It authorizes the use of public funds for other than a public purpose, in violation of Article V, § 2(1), of the Constitution of North Carolina and of the due process clauses contained in Article I, § 19, of the Constitution of North Carolina and in the Fourteenth Amendment to the Constitution of the United States; (b) it authorizes the giving or lending of the credit of the State, through an agency of the State, to aid persons, associations or corporations

Foster v. Medical Care Comm.

without a vote of the people, in violation of Article V, § 3(2), of the Constitution of North Carolina; (c) it unlawfully delegates legislative authority to the Medical Care Commission, in violation of Article I, § 6, and Article II, § 1, of the Constitution of North Carolina; (d) it authorizes the issuance of bonds, constituting an indebtedness of the State, in violation of Article V, § 3, of the Constitution of North Carolina; (e) it authorizes the creation of a debt of a county, city, town or other unit of local government, without submission to the voters thereof, in violation of Article V, §§ 2(5) and 4, of the Constitution of North Carolina; (f) it exempts from taxation property owned by the Commission, in violation of Article V, § 2(3), of the Constitution of North Carolina; and (g) it authorizes financing of hospital facilities for lease to a church related institution, in violation of Article I, § 13, of the Constitution of North Carolina and of the First and Fourteenth Amendments to the Constitution of the United States.

The matter was heard in the Superior Court upon an agreed statement of facts, a jury trial being waived. The court concluded that the Act of the General Assembly does not violate either the State or the Federal Constitution in any of the respects alleged in the complaint. The court thereupon adjudged that the Commission is lawfully authorized and empowered to do all of the things set forth in the said Act of the General Assembly, in the manner in which it proposes to do them, and to perform all of the acts and functions which it has performed or proposes to perform, as set forth in such agreed statement of facts. The court further adjudged that the relief sought by the plaintiff be denied, that the plaintiff be nonsuited and the action be dismissed.

The following is a summary of the stipulated facts:

The plaintiff is a taxpayer of the State, Wake County and the City of Raleigh. The Commission is an agency of the State. The Act undertakes to vest in the Commission authority to effectuate a plan to issue revenue bonds to finance construction of public and private hospital facilities. Fifteen thousand dollars of public funds, derived from State tax collections, has been allotted by the Council of State from the Contingency and Emergency Appropriation for the use of the Commission in the implementation of this program. The Commission proposes to spend these funds in its administration of the Act. It also proposes to use the proceeds of such revenue bonds to finance

Foster v. Medical Care Comm.

and construct hospital facilities on land conveyed to the Commission. Upon construction, each such facility will be leased by the Commission to a public agency or to a nonprofit organization, which may or may not be church related, for its operation for a term extending to the date on which all bonds and other obligations of the Commission are paid. When the bonds are paid, the Commission will convey title to such facility to the lessee. The Commission proposes to enter into such leases with counties, cities, towns and other units of local government, without submitting the same to the approval of the voters therein. Under the terms of such leases the revenues generated by the leased facility will be applied to the payment of the revenue bonds, prior to the payment of the operating and maintenance costs.

A study made by the Commission of hospital needs indicates that approximately 3,200 new general hospital beds and beds for extended care will be required in North Carolina by 1977 and that there are now 4,883 hospital beds in the State in varying degrees of obsolescence. To meet this need for new beds and for modernization will require approximately $300,000,000. Funds available from private donors now cover only a minor portion of such capital costs. Approximately 50 per cent of the general hospitals in North Carolina are owned by local governments, which have the option of obtaining capital funds through the issuance of general obligation bonds, but the increasing demand on local governments for schools and other services has been so great that there is substantial resistance to bond issues for hospital construction. Funds available from Federal grants under the Hill-Burton program are now substantially less than in former years. The Federal loan program for supplying capital for hospital construction is subject to conditions making such loans unattractive to hospitals.

*Attorney General Morgan by Deputy Attorney General McGalliard and Assistant Attorney General Denson for defendants.*

*Bailey, Dixon, Wooten & McDonald by Kenneth Wooten, Jr. for plaintiff.*

LAKE, Justice.

The Act, G.S. 131-138 through G.S. 131-162, sets forth the following findings and declaration of policy by the General Assembly:

Foster v. Medical Care Comm.

G.S. 131-139: "Legislative findings.— It is hereby declared to be the policy of the State of North Carolina to promote the public health and welfare by providing means for the financing, acquiring, constructing, equipping and providing of hospital facilities to serve the people of the State and to make accessible to them modern and efficient hospital facilities.

"The General Assembly hereby finds and declares that:

"(1) There is a need to overcome existing and anticipated physical and technical obsolescence of existing hospital facilities and to provide additional, modern and efficient hospital facilities in the State; and * * *

"(3) In order to meet such shortage and thereby promote the public health and welfare of the people of the State, it is necessary for the State to assist in the providing of adequate, modern and efficient hospital facilities in the State so that health and hospital care and services may be expanded, improved and fostered to the fullest extent practicable.

"The General Assembly hereby further finds and declares that the financing, acquiring, constructing, equipping and providing of hospital facilities and such other facilities as may be incidental or appurtenant thereto are public uses and public purposes for which public money may be expended and that enactment of this Article is necessary and proper for effectuating the purposes hereof."

The Act provides, G.S. 131-161, that it shall be liberally construed to effect the said purposes. Powers conferred upon the Commission, G.S. 131-141, include the power:

"(8) To finance, acquire, construct, equip, provide, operate, own, repair, maintain, extend, improve, rehabilitate, renovate and furnish any hospital facilities * * * ;

"(9) To fix, revise, charge and collect or cause to be fixed, revised, charged and collected rents, fees and charges for the use of, or services rendered by, any hospital facilities; * * *

"(12) To apply for, accept, receive and agree to and comply with the terms and conditions governing grants,

loans, advances, contributions, interest subsidies and other aid with respect to hospital facilities from federal and State agencies or instrumentalities and to accept, receive, and agree to and comply with the terms and conditions governing payments under any health insurance programs."

G.S. 131-143 confers upon public agencies (defined in the Act to mean any county, city, town, hospital district or other political subdivision of the State authorized to acquire, operate and maintain hospital facilities) authority to enter into contracts, including lease agreements, with the Commission and, pursuant thereto, to operate, repair and maintain hospital facilities and to pay the cost thereof and the rent therefor "from any funds available for such purposes," subject, however, to the provisions of G.S. 131-145. The latter section provides that all obligations payable by such public agency under any such lease agreement, including its obligation to pay rent and the cost of operating, repairing and maintaining such hospital facilities, "shall be payable solely from the revenues of the hospital facilities being leased or other hospital facilities of the public agency related thereto," except that such public agency may "submit to its qualified voters a hospital facility maintenance tax."

The foregoing authorities of the Commission extend also to hospital facilities to be leased to and operated by private, nonprofit agencies, whether or not such agencies are church related. G.S. 131-141 (1) ; G.S. 131-144.

G.S. 131-145 provides that all such hospital facilities, whether operated by a public agency or by a private nonprofit agency, shall be operated to serve the general public without discrimination "against any person based on race, creed, color or national origin." This section authorizes the Commission to lease any hospital facility for operation and maintenance by such public or private, nonprofit agency and provides that such lease agreement "may include" provisions to the following effect:

(1) The lessee shall operate, repair and maintain such facilities at its own expense;

(2) The rental to be paid by the lessee shall not be less than an amount sufficient to pay the interest, principal and any redemption premium upon bonds issued by the Commission to finance the cost of such leased facilities;

(3) The lessee shall pay all other costs incurred by the Commission in connection with providing such leased facilities;

(4) The lease shall terminate "not earlier than" the date on which all such bonds and other obligations incurred by the Commission in connection with the leased facilities shall be paid in full, or adequate funds for such payment shall be deposited in trust; and

(5) The lessee's obligation to pay rent shall not be subject to cancellation by the lessee until such bonds have been paid or sufficient funds therefor have been made available for their payment.

G.S. 131-145 further provides that in cases wherein the site for the hospital facilities has been conveyed by the lessee, whether a public or private nonprofit agency, to the Commission without the payment of any consideration therefor, or where the cost of such acquisition has been paid from proceeds of such bonds, and such bonds have been paid, the Commission shall promptly convey or reconvey the title to the property to the lessee.

G.S. 131-148 authorizes the Commission to issue bonds to carry out its corporate purposes. The principal of and interest on such bonds are payable solely from funds provided therefor by the Act.

G.S. 131-147 provide that such bonds "shall not be deemed to constitute a debt, liability or obligation of the State or of any political subdivision thereof or a pledge of the faith and credit of the State or of any such political subdivision, but shall be payable solely from the revenues and other funds provided therefor," and each bond shall contain upon its face a statement to this effect. By G.S. 131-149 the Commission may enter into a trust agreement for the security of such bonds, which agreement may pledge "all or any part of the revenues of the Commission received pursuant to this Article, including, without limitation, fees, rents, charges, insurance proceeds, condemnation awards and any other revenues and funds received in connection with any hospital facilities," but the Commission "shall not mortgage any hospital facilities."

By G.S. 131-150 the Commission is authorized "to fix and to collect fees, rents and charges for the use of any hospital

facility," and may require the lessee of such facility to "operate, repair and maintain" the same, subject to the above mentioned limitation in G.S. 131-145 concerning the liability therefor of a public agency. This section of the Act also provides that "fees, rents and charges shall be fixed so as to provide a fund" sufficient to pay the cost of operating, repairing and maintaining the facility, to. pay the principal of and interest on all bonds and to create and maintain any reserve provided for in the resolution authorizing or the trust agreement securing such bonds.

G.S. 131-158 provides that the Commission "shall not be required to pay any tax or assessment on any property owned by the Commission" under the provisions of the Act or upon the income therefrom. This section also provides that any bonds or notes issued by the Commission under the provisions of the Act, their transfer and the income therefrom, "shall at all times be free from taxation by the State or any local unit or political subdivision or other instrumentality of the State, excepting inheritance or gift taxes."

G.S. 131-142 sets forth the criteria or standards to be observed by the Commission in the exercise of its authorities under this Act. It provides:

> *"Criteria and requirements.*—In undertaking any hospital facilities pursuant to this Article, the Commission shall be guided by and shall observe the following criteria and requirements; *provided that the determination of the Commission as to its compliance with such criteria and requirements shall be final and conclusive:* [Emphasis added.]

> "(1) There is a need for the hospital facilities in the area in which the hospital facilities are to be located;

> "(2) No hospital facility shall be leased to any public or nonprofit agency which is not financially responsible and capable of fulfilling its obligations under the agreement of lease, including the obligations to pay rent, to operate, repair and maintain at its own expense the hospital facilities leased and to discharge such other responsibilities as may be imposed under the lease;

> "(3) Adequate provision shall be made for the payment of the principal of and interest on the bonds and any necessary reserves therefor and for the operation, repair

and maintenance of the hospital facilities at the expense of the lessee; and

"(4) The public facilities, including utilities, and public services necessary for the hospital facilities will be made available."

With reference to the administrative expenses of the Commission, G.S. 131-147 provides:

"Expenses incurred by the Commission in carrying out the provisions of this Article may be made payable from funds provided pursuant to, or made available for use under, this Article and no liability shall be incurred by the Commission hereunder beyond the extent to which moneys have been so provided."

G.S. 131-154 provides that bonds issued under the provisions of this Act are "hereby made securities in which all public officers and public bodies of the State and its political subdivisions, all insurance companies, trust companies, banking associations, investment companies, executors, administrators, trustees and other fiduciaries may properly and legally invest funds, including capital in their control or belonging to them." Thus, the Act makes it lawful for guardians of and trustees for minor children and incompetents, executors and administrators of estates and trustees of charities to invest the capital held in trust for such wards and beneficiaries in these bonds, for which no one is personally liable and which are unsecured except by a pledge of revenues to be produced in the future by such hospital facilities.

We first consider the plaintiff's contention that the Act unlawfully delegates legislative authority to the Commission.

Article I, § 6, of the Constitution of North Carolina, provides, "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other," and Article II, § 1, thereof, provides, "The legislative powers of the State shall be vested in the General Assembly * * *."

This Court has repeatedly held that the General Assembly may neither abdicate its authority to make laws nor delegate that authority to other departments of the Government or to subordinate administrative agencies. *Turnpike Authority v. Pine*

Foster v. Medical Care Comm.

*Island,* 265 N.C. 109, 143 S.E. 2d 319; *In re Annexation Ordinances,* 253 N.C. 637, 117 S.E. 2d 795; *Redevelopment Commission v. Bank,* 252 N.C. 595, 114 S.E. 2d 688; *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310; *Cox v. Kinston,* 217 N.C. 391, 8 S.E. 2d 252. It is, however, also established by these decisions that the General Assembly, having itself declared the policy to be effectuated and having established the broad framework of law within which it is to be accomplished and standards for the guidance of the administrative agency, may delegate to such agency the authority to make determinations of fact upon which the application of a statute to particular situations will depend. The distinction is thus stated in *Coastal Highway v. Turnpike Authority, supra:*

"Since legislation must often be adapted to complex conditions involving numerous details with which the Legislature cannot deal directly, the constitutional inhibition against delegating legislative authority does not deny to the Legislature the necessary flexibility of enabling it to lay down policies and establish standards, while leaving to designated governmental agencies and administrative boards the determination of facts to which the policy as declared by the Legislature shall apply. * * *

"[T]he legislative body must declare the policy of the law, fix legal principles which are to control in given cases, and provide adequate standards for the guidance of the administrative body or officer empowered to execute the law. * * *

"In short, while the Legislature may delegate the power to find facts or determine the existence or nonexistence of a factual situation or condition on which the operation of a law is made to depend, or another agency of the government is to come into existence, it cannot vest in a subordinate agency the power to apply or withhold the application of the law in its absolute or unguided discretion."

[1] In the Act here in question, the Legislature has declared the policy of the State and has established the broad framework of law within which it is to be accomplished. In G.S. 131-142 it has etablished standards and requirements which the Commission is to observe in determining the eligibility of each proposed project for the contemplated financial aid. We do not find in

this Act a delegation of legislative power such as would require the conclusion that the Act, in its entirety, is unconstitutional.

[2]  Our decision in this respect is not to be understood, however, as a recognition of validity in the proviso in G.S. 131-142, reading: "[P]roviding that the determination of the Commission as to its compliance with such criteria and requirements shall be final and conclusive." The determination by an administrative body, such as the Commission, that, in a specific instance, it has complied with conditions precedent to the exercise of its statutory authority, is its determination of a question of law and is subject to judicial review.

Our decision herein is also not to be construed as a recognition of the validity of any agreement or contract made by the Commission with an agency of the Federal government, or other agency or instrumentality, under the authority ostensibly granted to the Commission by G.S. 131-141 (12). This provision of the Act purports to grant to the Commission power to "agree to and comply with" whatever terms and conditions may be imposed by such agency upon grants, loans and the like, to the Commission with respect to hospital facilities and also to "agree to and comply with" conditions governing payments under any health insurance programs. In its broadest aspects, this provision of the Act might be deemed to grant to the Commission authority to enter into an agreement with such other agency obligating the Commission to take actions beyond the scope of the Act before us. See *Vance County v. Royster,* 271 N.C. 53, 155 S.E. 2d 790. It does not appear from the record before us that any such contract has been made by the Commission. Consequently, the interpretation and validity of this provision in the Act are not before us for determination in this action.

[3]  We next consider the contention of the plaintiff that the Act authorizes an unconstitutional lending of the credit of the State, and an unconstitutional authorization of the creation of an indebtedness of the State, in violation of Article V, §§ 3 (2) and 3 (1), respectively, of the Constitution of North Carolina.

The Act specifically provides that bonds or notes issued by the Commission under the provisions of this Act shall not be deemed to constitute a debt, liability or obligation of the State or of any political subdivision thereof, or a pledge of the faith and credit of the State or of any such political subdivision, but "shall be payable solely from the revenues and other funds pro-

vided therefor." Each such bond or note must contain upon its face a statement to the effect that neither the faith and credit nor the taxing power of the State or of any of its political subdivisions is pledged for the payment of either the principal of or the interest upon such bond or note.

The Commission is a State agency. G.S. 131-117. Any bond or note which it may issue, pursuant to this Act, will be an undertaking by it to pay the specified sum out of revenues received by it in accordance with the provisions of this Act only, and is declared by the Act, G.S. 131-153, to be a negotiable instrument. Nevertheless, this Court has held in numerous decisions that such bonds or notes are not debts of the State, or of a State agency, within the meaning of the constitutional provisions relied upon by the plaintiff. *Martin v. Housing Corp.*, 277 N.C. 29, 175 S.E. 2d 665; *Vance County v. Royster, supra; Turnpike Authority v. Pine Island, supra; Keeter v. Town of Lake Lure*, 264 N.C. 252, 141 S.E. 2d 634; *Ports Authority v. Trust Co.*, 242 N.C. 416, 88 S.E. 2d 109; *Britt v. Wilmington*, 236 N.C. 446, 73 S.E. 2d 289; *Williamson v. High Point*, 213 N.C. 96, 195 S.E. 90; *Brockenbrough v. Commissioners*, 134 N.C. 1, 46 S.E. 28.

The issuance of such bonds does not constitute a giving or lending of the credit of the State, or of its agency, within the meaning of the constitutional provisions relied upon by the plaintiff. *Keeter v. Town of Lake Lure, supra; Ports Authority v. Trust Co., supra.* The State of Florida has a similar provision in its Constitution. In *Nohrr v. Brevard County Educational Facilities Authority (Fla.)*, 247 So. 2d 304, the Florida Court said: "The word 'credit' * * * implies the imposition of some new financial liability upon the State or a political subdivision which in effect results in the creation of a State or political subdivision debt for the benefit of private enterprises. In order to have a gift, loan or use of public credit, the public must be either directly or contingently liable to pay something to somebody." The Supreme Courts of Massachusetts and New Jersey have also held that the issuance of such revenue bonds does not constitute a lending of the credit of the State within the meaning of such a constitutional provision. Opinion of the Justices, 354 Mass. 779, 236 N.E. 2d 523; *Clayton v. Kervick*, 52 N.J. 138, 244 A 2d 281.

We hold, therefore, that the Act does not authorize the contracting of a debt by the State, or its agency, or the pledg-

ing, giving, or lending of the faith and credit of the State, or of its agency, in violation of the constitutional provisions relied upon by the plaintiff.

[4] We turn next to the plaintiff's contention that the Act authorizes counties, cities, towns and other political subdivisions of the State to incur debts, in violation of Article V, § 4, of the Constitution of North Carolina, which provides: "For any purpose other than these enumerated (which do not extend to the purposes of the present Act), the General Assembly shall have no power to authorize counties, cities and towns, and other units of local government to contract debts, and counties, cities and towns, and other units of local government shall not contract debts, during any fiscal year, to an amount exceeding two-thirds of the amount by which the outstanding indebtedness of the particular county, city or town, or other unit of local government shall have been reduced during the next preceding fiscal year, unless the subject is submitted to a vote of the people of the particular county, city or town, or other unit of local government and is approved by a majority of the qualified voters who vote thereon."

The Act provides that such units of local government are authorized to enter into contracts and agreements, including agreements of lease, with the Commission and therein to agree to pay rent sufficient to retire the bonds issued for the construction of the leased hospital facility and also to agree to operate, repair and maintain such facility. G.S. 131-143 and G.S. 131-145. The undertaking of such obligation would clearly create a debt of the lessee within the meaning of the constitutional provision, nothing else appearing.

G.S. 131-145 provides that all obligations payable by any such governmental unit under a lease agreement "shall be payable solely from the revenues of the hospital facilities being leased *or other hospital facilities of the public agency related thereto*" (emphasis added), unless a hospital facility maintenance tax is submitted to the qualified voters of such governmental unit. Had this provision of the Act made such obligation of the lessee payable only from revenues derived from the leased facilities, the above cited decisions relating to what constitutes a debt of the State would be applicable. However, such is not the case. The Act expressly provides that revenues derived from other hospital facilities owned by the lessee, and related to the leased

facility, shall or may be liable for the payment of such obligation.

In a particular instance, it could well be true that the leased facility, constructed by the Commission with the use of proceeds of its bonds, will be an addition to a previously existing hospital of such a nature that it will, of itself, not produce enough revenues to retire the bonds. In that event, the lease authorized by the Act would require the use of revenues derived from the preexisting hospital facility. Conceivably, this could endanger the continued operation of the entire hospital.

On the authority of *Vance County v. Royster, supra,* we hold that such a lease agreement would constitute a debt of such governmental unit, within the meaning of Article V, § 4, of the Constitution of North Carolina, and that by authorizing counties, cities, towns and other units of local government to contract such a debt beyond the amount specified in the Constitution, without submitting the subject to a vote of the people, the General Assembly exceeded its constitutional authority.

This provision of our State Constitution does not deprive any county, city, town or other political subdivision of the State of the power to enter into such lease agreement. It merely declares that the people residing in such governmental unit, not its board of commissioners, shall have the power of decision. If it be true, as stated in the affidavit of William F. Henderson, made part of the agreed statement of facts submitted to the Superior Court, that "the increasing demand on local government for schools and other services has been so overwhelming that there is a great resistance to bond issues for hospital construction," so that the people of such political subdivision might not approve the assumption of the obligations contained in the lease agreement, that circumstance is not a reason for depriving them of the right of decision conferred upon them by the Constitution. See *Vance County v. Royster, supra.*

[5] We consider next the contention of the plaintiff that the Act is unconstitutional for the reason that it exempts from taxation property owned by the North Carolina Medical Care Commission, pursuant to the provisions of the Act, which would include hospital facilities constructed and leased by it, and income from such property.

The plaintiff does not attack the validity of the portion of G.S. 131-158 which exempts from taxation, other than in-

heritance or gift taxes, the bonds or notes issued by the Commission, their transfer and the income therefrom. In *Martin v. Housing Corp., supra,* and in *Educational Assistance Authority v. Bank,* 276 N.C. 576, 174 S.E. 2d 551, this Court held that the General Assembly may grant such tax exemption to similar bonds issued by the North Carolina Housing Corporation and the State Educational Assistance Authority.

Article V, § 2(3), of the Constitution of North Carolina, provides: "Property belonging to the State, counties, and municipal corporations shall be exempt from taxation. The General Assembly may exempt cemeteries and property held for educational, scientific, literary, cultural, charitable, or religious purposes * * *."

As above noted, the Commission is an agency of the State. The property owned by it, including hospital facilities leased to private nonprofit associations for operation, is property owned by the State within the meaning of this constitutional provision, making the exemption of such property from taxation mandatory. The tax exemption to which the plaintiff objects is an exemption of the Commission, not the lessee. However, the constitutional provision relied upon by the plaintiff expressly authorizes the General Assembly to exempt property held for charitable purposes, even though not owned by the State, a county or a municipal corporation. Thus, there is no merit in this contention of the plaintiff. *Martin v. Housing Corp., supra; Wells v. Housing Authority,* 213 N.C. 744, 197 S.E. 693.

We come now to the plaintiff's most serious attack upon the validity of the Act, which is that the construction of hospital facilities for lease to, and ultimate conveyance to, a private agency, though a nonprofit agency, is not a public purpose and, therefore, public funds, raised by taxation, may not lawfully be appropriated or expended for such purpose or to implement the administration of the Act.

Article V, § 2(1), of the Constitution of North Carolina, provides, "The power of taxation shall be exercised * * * for public purposes only * * *."

As we said in *Mitchell v. Financing Authority,* 273 N.C. 137, 159 S.E. 2d 745: "The power to appropriate money from the public treasury is no greater than the power to levy the tax

which put the money in the treasury. Both powers are subject to the constitutional proscription that the tax revenues may not be used for private individuals or corporations, *no matter how benevolent.*" (Emphasis added.) Accord: *Horner v. Chamber of Commerce,* 231 N.C. 440, 57 S.E. 2d 789. The immediate question for our decision here, as in the Mitchell case, is whether the $15,000, allotted by the Council of State from the Contingency and Emergency Fund for use of the Commission in implementing the revenue bond program authorized by the Act, was lawfully appropriated and may lawfully be expended by the Commission for such purpose.

The General Assembly has declared in the Act that the financing and construction of hospital facilities is a public purpose for which public money may be expended and that the enactment of this Act is necessary and proper for effectuating the purposes therein set forth. Such an expression of opinion by the General Assembly is entitled to, and is always given, great weight by this Court, but it is not conclusive. It is the duty and prerogative of this Court to determine whether an appropriation of tax funds is for a purpose forbidden by the Constitution of the State when, as here, that question is properly raised. *Mitchell v. Financing Authority, supra; Keeter v. Town of Lake Lure, supra; Redevelopment Commission v. Bank,* 252 N.C. 595, 114 S.E. 2d 688; *Nash v. Tarboro,* 227 N.C. 283, 42 S.E. 2d 209; *Wells v. Housing Authority, supra; Briggs v. Raleigh,* 195 N.C. 223, 141 S.E. 597.

It is well settled that the expenditure of tax funds for the construction of a hospital, to be owned and operated by the State, a county, a city, town or other political subdivision of the State, is an expenditure for a public purpose. *Rex Hospital v. Commissioners of Wake,* 239 N.C. 312, 79 S.E. 2d 892; *Hospital v. Commissioners of Durham,* 231 N.C. 604, 58 S.E. 2d 696. Obviously, the primary purpose of a nonprofit privately owned hospital is the same as that of a publicly owned hospital for the treatment of like diseases and injuries. It does not necessarily follow, however, that the construction and operation of the privately owned hospital is for a public purpose, within the meaning of the constitutional limitation upon the use of tax funds.

[6]   The circumstance that the privately owned hospital is not operated for profit is not determinative. "[T]ax revenues may not be used for private individuals or corporations, no matter

how benevolent." *Mitchell v. Financing Authority, supra.* "Many objects may be public in the general sense that their attainment will confer a public benefit or promote the public convenience but not be public in the sense that the taxing power of the State may be used to accomplish them." Cooley on Taxation, page 383, quoted with approval in *Nash v. Tarboro, supra,* and in *Briggs v. Raleigh, supra.*

It is elementary that the promotion and protection of the public health is a proper subject for exercise of the police power of the State and, obviously, hospitals, whether publicly or privately owned, are operated for that purpose and subject to State regulation. The power of the State to regulate privately owned institutions under its police power is, however, more extensive than the authority of the Legislature to expend tax money for the accomplishment of the same purpose. Article V, § 2(1), is a limitation upon the legislative power, separate and apart from the limitation contained in the Law of the Land Clause in Article I, § 19, of the Constitution of North Carolina, and the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. Nor does the authority of the State to expend tax funds to construct and operate a hospital of its own necessarily carry with it the authority to expend such funds to subsidize a privately owned hospital.

"For the most part, the term 'public purposes' is employed in the same sense in the law of taxation and in the law of eminent domain." Cooley on Taxation, 4th Ed., § 176, quoted with approval in *Mitchell v. Financing Authority, supra.* Thus, if the General Assembly may authorize a State agency to expend public money for the purpose of aiding in the construction of a hospital facility to be leased to and ultimately conveyed to a private agency, it may also authorize the acquisition of a site for such facility by exercise of the power of eminent domain. See *Mitchell v. Financing Authority, supra.*

The present case is distinguishable from *Redevelopment Commission v. Bank, supra,* and *Wells v. Housing Authority, supra.* In those cases the primary purpose of the legislation was to protect the public health by eliminating existing slums, replacing them with safe and sanitary housing or other buildings and assuring that the blighted condition would not return. The fact that such project would benefit individuals permitted to rent the new housing units or other new buildings or to purchase, own and use them, after the accomplishment of the

primary purpose of the law, was deemed incidental thereto. Thus, the authorization in the statute for such rental or sale was not deemed sufficient to change the purpose of the law from a public purpose to one private in nature. While the Act now before us provides for ownership of the acquired property by a public agency until the bonds issued to finance the contemplated construction are retired, the Act has no purpose separate and apart from the operation by and ultimate conveyance of the hospital facility to the lessee thereof.

In *Mitchell v. Financing Authority, supra,* we said: "Often public and private interests are so co-mingled that it is difficult to determine which predominates. It is clear, however, that for a use to be public its benefits must be in common and not for particular persons, interests, or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that of an individual or private entity." A private entity does not cease to be such merely because it is a nonprofit association or corporation engaged in a meritorious, charitable activity in which the State, itself, may lawfully engage. Notwithstanding the provision in G.S. 131-145 that all hospital facilities (which we construe to mean facilities constructed, owned and leased by the Commission pursuant to this Act) shall be operated to serve and benefit the general public without discrimination against any person based on race, creed, color or national origin, such facility leased to and operated by a private, nonprofit agency remains a private facility. It is privately managed and controlled.

[7]  We hold that the expenditure of public funds raised by taxation to finance, or facilitate the financing of, the construction of a hospital facility to be privately operated, managed and controlled is not an expenditure for a public purpose and is prohibited by Article V, § 2(1), of the Constitution of North Carolina. We have carefully considered the following decisions to the contrary by courts of our sister states: *Fort Sanders Presbyterian Hospital v. Health & Education Facilities Board of the County of Knox,* 453 S.W. 2d 771 (Tenn. 1970) ; *Truitt v. Board of Public Works of Maryland,* 243 Md. 375, 221 A. 2d 370 (1966) ; *Lien v. City of Katchikan,* 383 P. 2d 721 (Alaska, 1963) ; *In re Opinion of the Justices,* 99 N.H. 536, 114 A. 2d 801; Opinion of the Justices (Mass.), *supra.* Notwithstanding our great respect for the opinions of those courts, we do not find their reasoning persuasive in this instance.

Foster v. Medical Care Comm.

Since we hold that public funds raised by taxation may not lawfully be expended to finance, or facilitate the financing of, the construction of any hospital facility which is to be privately operated, managed and controlled, we do not reach, and express no opinion concerning, the plaintiff's contention that such an expenditure in connection with construction of a facility to be leased to a church related hospital is also an encroachment upon rights of conscience, in violation of Article I, § 13, of the Constitution of North Carolina, and of the First and Fourteenth Amendments to the Constitution of the United States.

We, therefore, hold that the Superior Court erred in its Conclusion No. 1, to the effect that the Act is not unconstitutional in authorizing the Commission to use public funds raised by taxation to construct hospital facilities to be leased and ultimately conveyed to private, nonprofit agencies, and in its Conclusion No. 5, to the effect that the Act is not unconstitutional in that it authorizes the creation of a debt by a county, city, town, or other unit of local government without the approval of the voters thereof. The unconstitutional portions of the Act, noted herein above, are not separable from the remainder of the Act. The Superior Court, therefore, erred in denying the relief sought by the plaintiff and in dismissing the action.

The judgment of the Superior Court of Wake County is, therefore, reversed and this matter is remanded to that court for the entry by it of a judgment restraining and enjoining the defendants from expending the funds allocated to it by the Council of State from the Contingency and Emergency Fund for the implementation of the Act and from the expenditure for such purpose of any other public funds raised by taxation, and further enjoining the Commission from entering into any lease agreement with any public agency, as defined in the Act, by which agreement any revenues of the lessee, other than revenues produced solely by the operation of the leased facility, are made liable or usable for the payment of any obligation of such lessee under such agreement, in excess of the amount specified in Article V, § 4(1), of the Constitution of North Carolina, unless and until such proposed agreement is submitted to and approved by the qualified voters of such lessee in an election held pursuant to law.

Reversed and remanded.